**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

MAXWELL VAN DE VELDE, Individually and
on behalf of all others similarly situated,

            Plaintiff,

    v.

BANK OF AMERICA CORPORATION;
BARCLAYS BANK PLC; CITIBANK, NA;
CREDIT SUISSE GROUP, NA; DEUTSCHE
BANK AG; HBOS plc; HSBC HOLDINGS PLC;
J.P. MORGAN CHASE & CO.; LLOYDS
BANKING GROUP PLC; RABOBANK GROUP;
THE ROYAL BANK OF SCOTLAND GROUP
PLC; UBS AG; and WESTLB AG,

            Defendants.

    No. 11 Civ. 6120 (GBD)

    **ECF Case**

    **CLASS ACTION COMPLAINT**

    <u>**JURY TRIAL DEMANDED**</u>

Plaintiff, Maxwell Van De Velde ("Plaintiff"), alleges the following facts upon personal

knowledge as to himself and his own acts, and upon information and belief as to all other

matters. As set forth below, Plaintiff is a professional Financial Advisor, who has spent forty

years in the business of advising clients regarding the purchase and sale of various financial

instruments, including financial instruments the value of which is or was linked to the London

Interbank Offered Rate ("LIBOR"). He thus has acquired extensive personal knowledge

regarding the markets and instruments at issue in this putative class action. As a result,

Plaintiff's information and beliefs are based both on his own knowledge regarding the financial

market and the financial instruments involved in this action and on the investigation of his

counsel. This investigation has included: (i) factual investigation of the allegations set forth

herein; (ii) consultation with expert economists regarding the allegations set forth herein; (iii)

review and analysis of LIBOR rates and the differences between LIBOR rates and similar interest rates; (iv) review and analysis of the court filings of other cases; and (v) review and analysis of a variety of media reports, including the recent announcement on July 26, 2011 by Defendant UBS AG that it has been granted conditional immunity by the United States Department of Justice and other law enforcement and regulatory agencies in connection with those agencies' investigation into the unlawful conduct alleged herein.

## I.   SUMMARY OF THE ACTION

1.   This case is brought to recover damages for the injuries sustained by Plaintiff and the members of the Plaintiff Class as a result of two separate, but related, courses of unlawful conduct by the Defendants. First, Defendants conspired among themselves to artificially reduce the LIBOR rate, which, as set forth in detail below, is a trimmed average of the interest rates at which designated contributor banks borrow unsecured funds from other banks in the London wholesale market. Second, Defendants misrepresented their actual borrowing data in order to improve the appearance of their own financial condition. Defendants engaged in these illegal acts in order to pay lower interest rates on interest-bearing financial instruments under which Defendants would otherwise have faced substantial liabilities, among other reasons.

2.   Although the unlawful conduct alleged herein was conducted in connection with the market for loans between the Defendant banks, because the LIBOR rate is well-known as a benchmark interest rate used throughout the financial markets, the conduct directly and proximately caused damage to at least thousands of investors who purchased or sold financial instruments the value of which was on their face tied to the LIBOR rate. Defendants knew their

unlawful scheme would directly harm these investors but nevertheless pursued their course of

conspiracy and misrepresentation in order to benefit their financial positions.

3.     This action is brought on behalf of all investors who purchased or sold financial

instruments the value of which were on their face tied to the LIBOR rate and who suffered losses

as a result of the conduct alleged herein, excluding direct purchasers from the Defendants,

between August 2007 and the date on which Defendants' illegal conduct ceases (the "Class

Period"). The Plaintiff Class seeks damages resulting from Defendants' violations of: (1) the

Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*; (2)

New York Gen. Bus. Law §§ 340, *et seq.*; and (3) other similar state laws permitting recovery by

indirect purchasers of damages inflicted by conspiratorial activity such as that set forth herein.

## II.     JURISDICTION AND VENUE

4.     This action is instituted under 18 U.S.C. §§1961 *et seq.*, New York Gen. Bus.

Law §§ 340, *et seq.*, and a variety of state laws detailed herein, to recover treble damages and the

costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries

sustained by Plaintiff and the members of the Plaintiff Class.

5.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 18 U.S.C. § 1965. This

Court also has subject matter jurisdiction over this class action pursuant to the Class Action

Fairness Act of 2005, which amended 28 U.S.C. § 1332 to add a new subsection (d) conferring

federal jurisdiction over class actions where, as here, any member of a class of Plaintiff is a

citizen of a state different from any Defendant and the aggregated amount in controversy exceeds

$5,000,000, exclusive of interest and costs. This Court also has jurisdiction under 28 U.S.C. §

1332(d) because "one or more members of the class is a citizen of a state within the United

States and one or more of the Defendants is a citizen or subject of a foreign state." This Court

also has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over all other claims that are

so related to claims over which this Court may exercise original jurisdiction that they form part

of the same case or controversy. This Court has jurisdiction over the Defendant named herein

because each is either a corporation that conducts business in and maintains operations in this

District, or is an individual with sufficient minimum contacts with this District so as to render the

exercise of jurisdiction by this Court over him or her permissible under traditional notions of fair

play and substantial justice.

6.      Venue is appropriate in this District under 18 U.S.C. § 1965 and 28 U.S.C. §

1391(b), (c) and (d), because during the Class Period the Defendants resided or transacted

business in this District, and because a substantial portion of the affected interstate commerce

described herein was carried out in this District.

7.      The activities of the Defendants and their co-conspirators, as described herein,

were within the flow of, were intended to have, and did have direct, substantial and reasonably

foreseeable effects on the foreign and interstate commerce of the United States.

III.    THE PARTIES

   A.    Plaintiff

8.      Plaintiff is a professional financial adviser involved in the business of advising

clients regarding the purchase and sale of financial products, including financial products tied to

the LIBOR rate. During the Class Period, Plaintiff: (1) purchased an exchange-traded LIBOR-

based derivative, and was thereby damaged by Defendants' conduct as alleged herein; and (2)

sold LIBOR-based derivatives to clients for amounts lower than those derivatives would have

4

been sold in the absence of the misconduct alleged herein, and thus was damaged as a result of the misconduct alleged herein.

**B.     Defendants**

9.      Defendant Bank of America Corporation ("BofA") is a Delaware Corporation headquartered in Charlotte, North Carolina. Defendant BofA has numerous offices within this judicial district. At all relevant times, Defendant BofA was a contributing member of the British Bankers' Association U.S. Dollar LIBOR panel.

10.     Defendant Barclays Bank plc ("Barclays") is a United Kingdom public limited company headquartered in London, England. At all relevant times, Defendant Barclays was a contributing member of the British Bankers' Association U.S. Dollar LIBOR panel.

11.     Defendant Citibank NA ("Citibank") is a wholly-owned subsidiary of Citigroup, Inc., a Delaware corporation headquartered in New York, New York. At all relevant times, Defendant Citibank was a contributing member of the British Bankers' Association U.S. Dollar LIBOR panel.

12.     Defendant Credit Suisse Group AG ("Credit Suisse") is a company formed under the laws of Switzerland, with its headquarters in Zurich, Switzerland. At all relevant times, Defendant Credit Suisse was a contributing member of the British Bankers' Association U.S. Dollar LIBOR panel.

13.     Defendant Deutsche Bank ("Deutsche") is a German financial services company headquartered in Frankfurt, Germany. At all relevant times, Defendant Deutsche was a contributing member of the British Bankers' Association U.S. Dollar LIBOR panel.

14.     Defendant HBOS PLC ("HBOS") is a banking and insurance company headquartered in Edinburgh, Scotland. Through an acquisition in 2009, HBOS is now a wholly owned subsidiary of Lloyds Banking Group PLC. At all relevant times, Defendant HBOS was a contributing member of the British Bankers' Association U.S. Dollar LIBOR panel.

15.     Defendant HSBC Holdings plc ("HSBC") is a United Kingdom public limited company headquartered in London, England.  At all relevant times, Defendant HSBC was a contributing member of the British Bankers' Association U.S. Dollar LIBOR panel.

16.     Defendant J.P. Morgan Chase & Co. ("J.P. Morgan Chase") is a financial holding company formed under the laws of Delaware, and headquartered in New York, New York.  At all relevant times, Defendant J.P. Morgan Chase was a contributing member of the British Bankers' Association U.S. Dollar LIBOR panel.

17.     Defendant Lloyds Banking Group PLC ("Lloyds") is a United Kingdom public limited company headquartered in London, England.  At all relevant times, Defendant Lloyds was a contributing member of the British Bankers' Association U.S. Dollar LIBOR panel.

18.     Defendant Rabobank Group ("Rabobank") is a financial services provider with its headquarters in Utrecht, the Netherlands. At all relevant times, Defendant Rabobank was a contributing member of the British Bankers' Association U.S. Dollar LIBOR panel.

19.     Defendant Royal Bank of Scotland Group PLC ("RBS") is a United Kingdom public limited company headquartered in Edinburgh, Scotland.  At all relevant times, Defendant RBS was a contributing member of the British Bankers' Association U.S. Dollar LIBOR panel.

6

20.     Defendant UBS AG ("UBS") is a Swiss company based in Basel and Zurich, Switzerland. At all relevant times, Defendant UBS was a contributing member of the British Bankers' Association U.S. Dollar LIBOR panel.

21.     Defendant WestLB AG ("WestLB") is a German joint stock company headquartered in Dusseldorf, Germany.  At all relevant times, Defendant WestLB was a contributing member of the British Bankers' Association U.S. Dollar LIBOR panel.

IV.     FACTUAL BACKGROUND

A.     LIBOR

22.     LIBOR is an acronym for the London Interbank Offered Rate, meaning the rate of interest that purportedly would be paid on a loan from one bank to another.  Owned and operated by the British Bankers Association ("BBA"), calculated by Thomson/Reuters ("Reuters"), LIBOR is a daily benchmark interest rate based on the trimmed average of interest rates at which designated contributor banks borrow unsecured funds from other banks in the London wholesale money market for maturities ranging from overnight to one year.  LIBOR is calculated for 10 different currencies. This action arises from Defendants' unlawful manipulation of the U.S. dollar LIBOR.

23.     LIBOR was developed in the 1980s because banks were looking for a benchmark rate that would allow them to set rates on loans that would minimize the risks to banks of changing market interest rates. By pegging lending rates to LIBOR, which is supposed to represent the rate at which banks themselves could borrow money, banks sought to guarantee that the rates they charge their customers would never fall below their own cost of borrowing money.

7

24.     LIBOR is one of the most important and widely used financial baselines.  LIBOR anchors financial contracts totaling more than $300 trillion – the equivalent of $45,000 for every human being on the planet.[1]  More than $10 trillion of loans are indexed to LIBOR.

25.     During the majority of the class period, the LIBOR rate was computed daily according to a survey administered by the BBA to a fixed panel of sixteen large banks.  This survey asks each of the banks the following question:

> At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 a.m. London time?

The four largest and the four smallest rates are excluded, and the average of the remaining eight rates determines that day's LIBOR rate.[2]

26.     The survey asks at what rate the banks *could* borrow money, not at what rates they *have* borrowed or *are borrowing* money, thus injecting subjectivity, speculation, and the possibility of misrepresentation in connection with the market for loans into the process.  As Credit Suisse interest rate strategist William Porter was quoted as stating, "There's no underlying transaction actually done at Libor, so it's inherently subjective, and yet it fixes the interest rates on a large proportion of the world's interest-rate contracts."[3]

---

[1] Donald MacKenzie, "What's in a number? The importance of LIBOR," *Real-world Economics Review*, issue no. 47, October 3, 2008, at 237-242.

[2] In February 2011, the panel size was increased to 20 banks.  Reuters now calculates LIBOR by eliminating the five highest and lowest rates and averaging the remaining 10 rates.

[3] Taylor, "Libor Credibility Questioned as Credit Crunch Deepens," *The Telegraph*, April 17, 2008.

**B.**     **Defendants' Incentives to Minimize LIBOR Rates**

27.     The primary motive for all Defendants to mis-report their borrowing costs to the BBA was to understate their true borrowing costs and thus appear more financially robust than they actually were. If a bank's true borrowing costs were significantly higher than other banks, it would reveal to the market that the bank had financial difficulties, as higher interest rates charged to a bank would indicate a perception of greater risk associated with lending to that bank.

28.     Notably, Defendants' unlawful conduct was *not* motivated by desire to affect the securities market. While a lower LIBOR rate would by definition lower the amount paid to individuals and entities holding financial instruments whose returns were pegged to LIBOR, an artificially low LIBOR rate also would result in lower payments on all debts owed to any Defendant that were pegged to LIBOR. Thus, whether mis-reporting LIBOR had a positive or negative effect on any Defendants' profitability depended on whether that Defendant was a net borrower or net lender at the time of the misrepresentation. What the Defendants all had in common during the entire class period, however, was an interest in creating the greatest appearance of financial soundness during a time of significant market unrest by artificially lowering Defendants' own reported debt loads. This appearance of financial soundness would in turn maximize the likelihood that the Defendant banks would receive the lowest possible interest rates on their own debts.

**V.     MISCONDUCT BY THE DEFENDANTS**

9

29.     As described above, Defendants had both the motive and the opportunity to understate LIBOR by providing misleading information about their true borrowing costs to the BBA, which, in turn, would manipulate LIBOR artificially downward.

A.     **Publicly Available Sources Suggest That LIBOR Was Artificially Lowered.**

30.     Beginning no later than August 2007, Defendants intentionally created and caused to be created artificial LIBOR rates, including artificially low LIBOR rates.

31.     For example, from January 14, 2008, through April 16, 2008, LIBOR was understated by at least 20 basis points (a basis point, or "bps," is 1/100 of one percent).[4]  In their paper, Mr. Hartheiser and Mr. Spieser set forth various methods of calculation of what an accurate LIBOR should have been, based upon various regression models and forecasts of LIBOR using Treasury Bills, the Repo rate and other similar measures.

32.     This understatement of LIBOR can only be explained by a cartel of Defendants determined to understate LIBOR.  In fact, a *Wall Street Journal* article which examined the borrowing costs reported to the BBA by Defendants from January 2008 through April 2008 showed that the banks reported virtually identical borrowing costs, despite the fact that certain of the banks were in extreme financial distress, as compared to some of the more stable banks. Because the riskiness of the bank is an important factor in determining the rate that the bank can obtain loans, it is simply unbelievable that these reported borrowing costs were accurate.  For example, the three-month borrowing rates reported by Defendants during the first four months of 2008 remained, on the average, within a range of 0.06 of a percentage point.  As the *Wall Street*

---

[4]Hartheiser and Spieser, "Libor Rate and Financial Crisis:  Has the Libor Rate Been Manipulated?"

*Journal* quoted Stanford professor Darrell Duffie, these reported rates are "far too similar to be believed."[5]

33.    During this period, banks with extremely different risk profiles often reported the ability to borrow at identical or nearly identical rates.

34.    Even the money market committee of the Bank of England raised questions about the believability of LIBOR during the Class Period.  In November of 2007, minutes of a meeting of this committee disclosed that "several group members thought that Libor fixings had been lower than actual traded interbank rates through the period of stress."  Again, the April 3, 2008 minutes stated that "U.S. Dollar LIBOR rates had at times appeared lower than actual traded interbank rates."   After being appraised of numerous complaints about the veracity of LIBOR, the BBA stepped in on April 16, 2008 and warned member banks that anyone found misquoting rates would be removed from the survey.  Over the next two days, three-month LIBOR rose 18 basis points, the largest percentage increase since the market turmoil began in August 2007.

35.    The April 16, 2008 edition of the *Wall Street Journal* reported that an interest rate strategist at Defendant Citibank had admitted that LIBOR was overstated by as much as 30 basis points:

> In a recent research report on potential problems with LIBOR, Scott Peng, an interest-rate strategist at Citigroup, Inc. in New York, wrote that "the long term psychological and economic impacts this could have on the financial markets are incalculable." **Mr. Peng estimates that if banks provided accurate data about their borrowing costs, three-month LIBOR would be higher by as much as 0.3 percentage points.** [Emphasis added]

_____

[5]Mollenkamp and Whitehouse, "Study Casts Doubt on Key Rate," *Wall Street Journal* (May 29, 2008), at A1.

11

This is a remarkable admission on behalf of a Citigroup interest rate strategist, particularly given the fact that Citibank was among the lowest quotes submitted to the BBA a vast majority of the time during the Class Period.

36.     On May 29, 2008, *Bloomberg News* reported that a strategist at Defendant Barclays also admitted that banks "routinely" misstated borrowing costs to the BBA:

> Banks routinely misstated borrowing costs to the British Bankers' Association to avoid the perception they faced difficulty raising funds as credit markets seized up, said Tim Bond, a strategist at Barclays Capital.
>
> "The rates the banks were posting to BBA became a little bit divorced from reality," Bond, head of asset-allocation research in London, said in a Bloomberg Television interview.

This article continued by describing how one LIBOR-setting bank (Defendant UBS) submitted rates that were highly implausible in light of its financial troubles:

> As well as varying from member to member, rates show little correlation to banks' costs or insuring debt from default. UBS AG, whose default-insurance costs rose 919 percent between July 2 and April 15 as it racked up $38 billion of writedowns and losses, quoted dollar-borrowing costs that were lower than its rivals on 85 percent of the days during that period, Bloomberg data shows.

37.     Also on May 29, 2008, the *Wall Street Journal* reported that its investigation had concluded that LIBOR had been materially understated by improper submissions made to the BBA by the Defendants:

> The Journal analysis indicates that Citigroup, Inc., WestLB, HBOS PLC, J.P. Morgan Chase & Co. and UBS AG are among the banks that have been reporting significantly lower borrowing costs for the London interbank offered rate, or Libor, than what another market measure suggests they should be.

12

The Journal's analysis reported that Defendants Citigroup's submissions to the BBA were 87 basis points[6] lower than the rate should have been, based upon its calculations using default-insurance market data as a basis for its calculations. Likewise, Defendant WestLB's submissions averaged 70 basis points lower than the Journal's calculations suggest were accurate, and Defendants HBOS, J.P. Morgan and UBS' submissions were between 42 and 57 basis points too low.

### B.   Empirical Evidence Indicates That Defendants Manipulated LIBOR.

38.     The U.S. dollar LIBOR, in effect, measures the interest rate offered to panel banks to borrow U.S. dollar deposits, also known as Eurodollars. Eurodollars are also traded in the market, and the market rate for Eurodollars is commonly seen as the best market proxy for LIBOR. An analysis conducted by Connan Snider, a Professor at UCLA, and Thomas Youle, emphasized that, prior to August 2007, the previous day's Eurodollar bid rate was a better predictor of LIBOR than the previous day's LIBOR.

39.     Historically, the difference between LIBOR and Eurodollar rate, known as LIBOR-Eurodollar spread (effectively LIBOR minus the Eurodollar bid rate), averages 2.75 basis points. The spread was almost always positive, meaning the Eurodollar rate was slightly lower, reflecting the measurement of LIBOR as an offer rate and the Eurodollar rate as a bid rate on U.S. dollar deposits. After August 2007, Defendants' manipulation and suppression of LIBOR resulted in a decoupling of LIBOR and the Eurodollar rate, and a reversal of the

---

[6] A "basis point" is a commonly used term of measurement of interest rates for financial instruments because daily rate changes are typically smaller than 1 percent, though small changes have huge financial effects.

relationship so that the spread was negative.  In the post-manipulation period, the average spread was -24.70 basis points.

40.   Even more indicative of Defendants' manipulation was that after August 2007, the LIBOR-Eurodollar spread became strongly negative as opposed to a historic, mildly positive relationship.  This change in the historical relationship is evidence of the downward manipulation of LIBOR.  In some cases, LIBOR was 15 to 20 basis points lower than the Eurodollar market rate.  In effect, LIBOR reported that banks were offering Eurodollars at a rate lower than market participants were actually buying them, a result that strongly indicates Defendants' manipulation of LIBOR.



41.   When Snider and Youle performed the identical analysis for the period after August 2007, they found that the previous day's Eurodollar rate had less predictive power on LIBOR.  In fact, as LIBOR dropped below the Eurodollar rate, the previous day's LIBOR

14

became a better predictor of the current LIBOR.  This demonstrates that LIBOR was no longer

responding to market forces, but instead was the product of Defendants' manipulation.

### C.   LIBOR Diverges From Its Historical Relationship With Credit Default Swaps.

42.   A credit default swap ("CDS") is a swap contract and agreement in which the

protection buyer of the CDS makes a series of payments (often referred to as the CDS "fee" or

"spread") to the protection seller and, in exchange, receives a payment if the underlying credit

instrument (typically a bond or loan) experiences a credit event.  The spread serves as a measure

of the perceived risk of default by the entity issuing the underlying bond or receiving the loan.

The greater the risk of default on the underlying bond or loan, the greater the spread.  In the case

of a CDS whose underlying instrument is an interbank loan in which a panel bank is the

borrower, the greater the perceived risk that the panel bank will default on the loan, the higher its

CDS spread.

43.   CDSs are a useful benchmark for LIBOR because both CDSs and LIBOR are a

measure of perceived credit risks.  On May 29, 2008, Carrick Mollenkamp and Mark

Whitehouse ("Mollenkamp and Whitehouse") published an article in the *Wall Street Journal*,

emphasizing significant disparities between certain panel banks' perceived risk in the CDS

market and their LIBOR reporting.  A higher CDS spread is indicative of a larger perceived risk

in lending to an institution because it represents the cost of insuring against a default on that

loan.

44.   In their analysis, which followed Mollenkamp and Whitehouse, Snider and Youle

performed two separate comparisons between LIBOR and CDSs to highlight inconsistencies in

LIBOR reporting.  First, they noted that a specific reporting bank may have a comparatively

higher CDS spread than a second reporting bank (and therefore be perceived as comparatively "riskier"), while simultaneously having a lower LIBOR than the same bank (which would indicate that it is perceived as a "less risky" investment). For example, Citigroup consistently has a substantially higher CDS spread than the Bank of Tokyo - Mitsubishi, yet Citigroup reported comparatively lower LIBOR quotes. Mollenkamp and Whitehouse also noted the same pattern.

**D.    Inconsistencies With LIBOR Reporting By Individual Banks**

45.    A close examination of the borrowing rates reported by Defendants to Reuters for calculation of LIBOR during the Class Period and each bank's incentive to manipulate LIBOR further evidences Defendants' conspiracy to manipulate and suppress LIBOR. For example, Alexandre Harthieser of ESCP Europe and Natixis Bank and Phillippe K. Spieser, Professor of Finance at ESCP Europe, performed clustering analysis on the panel members' individual reporting and concluded that "a suspect cartel has been identified."

**1.    Panel Banks Report Inconsistent Rates Across Currencies.**

46.    Panel Banks report LIBOR across different currencies each day. Since LIBOR is a measure of a bank's stability as an institution, absent manipulation, the comparative ranking of panel banks should largely be the same across different currencies (allowing for the variation in panel composition across currencies). A comparison of LIBOR across different currencies shows this is not consistently so.

47.    For example, Bank of America and Bank of Tokyo-Mitsubishi both report rates to

Reuters for calculation of the U.S. dollar and Yen LIBOR. Over the manipulation period, it was common for Bank of America to simultaneously quote a lower rate than Bank of Tokyo-Mitsubishi in U.S. dollar LIBOR and a higher quote in the Yen LIBOR. Since institutional risk should be the same for each panel bank regardless of the what currency it is measured in, this indicates that the rates being reported do not accurately reflect market conditions and are an indication of manipulation.

### 2.  Bunching

48.   Throughout the Class Period, the rates reported by certain Defendants "bunch" around the fourth lowest quote each day. That is to say that the rates reported by those Defendants to Reuters were consistently near the fourth lowest of the 16 panel banks. Since Reuters, at the time, calculated LIBOR by removing the lowest (and highest) four reported rates everyday, bunching around the fourth lowest rate is suggestive that those Defendants collectively acted and colluded to suppress and manipulate LIBOR.

49.   As an initial matter, bunching among Defendants' reported rates demonstrates that Defendants intended to report the same or similar rates. The individual variation between the financial situation of each reporting bank should lead to differences in the reported rates. The fact that, throughout the Class Period, Defendants repeatedly reported identical rates to Reuters is an indication that the Defendants were conspiring to manipulate LIBOR. The chart below, for example, indicates that, in late 2008, Bank of America, UBS and Citibank reported nearly identical rates to borrow dollars for three months.

17



50.     Further, certain Defendants' consistent bunching of their reported rates at or near the fourth lowest position is suggestive of their intent to artificially suppress LIBOR. This is because the fifth lowest quote is the lowest quote that is included by Reuters in calculating the day's LIBOR. Defendants' clustering at or near the fourth lowest rate ensures that the artificially low rates reported by Defendants will be included in the BBA's daily calculation resulting in the artificial suppression of LIBOR.

51.     The following charts of daily U.S. dollar LIBOR reported rates show the frequency with which Defendants Bank of America, Citibank, HSBC, and JP Morgan reported within a given percentage rate from the 4th lowest quote. A negative difference means that they were below the 4th lowest quote, and therefore not included in the daily LIBOR calculation. Zero difference means that they either were the 4th lowest quote on a given day or tied at the same value as the 4th lowest quote.









52.     While bunching is reflective of Defendants' intention to report the lowest

borrowing rate to be calculated by Reuters, *i.e.*, the fifth lowest borrowing rate, this does not

suggest that the panel banks reporting the four lowest quotes (quotes that are discarded by

Reuters) are not members of the conspiracy.  Due to the mechanics of the LIBOR calculation,

there will always be discounted outliers.  If all of the panel banks reported the same low rate, the

lowest four would always be discounted.  Therefore, by bunching quoted rates around the 4th

lowest rate, the panel banks ensured the maximum downward manipulation.

## VI.     GOVERNMENTAL INVESTIGATIONS

53.     Several governmental agencies, including the U.S. Commodity Futures Trading

Commission, the Japanese Financial Supervisory Agency, and at least two other U.S. agencies,

have commenced investigations into the LIBOR reporting practices of Defendants during the

Class Period.

54.     The fact that multiple regulatory investigations had been commenced did not

come to light until March 15, 2011, when Defendant UBS disclosed in its annual report that it

had received subpoenas from the Commodity Futures Trading Commission as well as a request

for information from the Japanese Financial Supervisory Agency related to its LIBOR

submissions to the BBA.

55.     On July 26, 2011, Defendant UBS announced that it has been granted conditional

immunity by the United States Department of Justice and other law enforcement and regulatory

agencies in connection with those agencies' investigation into the unlawful conduct alleged

herein.  As set forth more fully below, Defendant UBS's grant of conditional leniency by the

Department of Justice necessarily requires UBS to admit to its complicity in the unlawful conduct alleged herein.

56.     To be granted conditional leniency from the Department of Justice, Defendant UBS necessarily has admitted to its complicity in the conspiracy alleged herein, and has provided information to global competition authorities confirming the identities, roles and activities of its co-conspirators.

57.     According to DOJ guidelines, a corporate amnesty applicant such as UBS AG must "admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes before it will received a conditional amnesty letter. A company that argues that an agreement to fix prices, rig bids, restrict capacity or allocate markets might be inferred from its conduct but that cannot produce any employees who will admit that the company entered into such an agreement, generally has not made a sufficient admission of criminal antitrust violation to be eligible for leniency. A company that, for whatever reason, is not able or willing to admit to its participation in a criminal antitrust conspiracy is not eligible for leniency."

58.     Similarly, in order to be granted leniency by the European Commission-which can result in either total immunity from, or a reduction of, fines assessed for anti-competitive conduct-a company that participated in a cartel "must provide evidence that enables the Commission to prove the cartel infringement."

## VII.   FRAUDULENT CONCEALMENT

59.     Throughout and beyond the conspiracy, Defendants affirmatively, actively and fraudulently concealed their unlawful conduct from Plaintiff and the Class. Defendants

conducted their conspiracy in secret and kept it mostly within the confines of their higher-level executives. Defendants publicly provided pre-textual and false justifications regarding their role in setting the LIBOR rates and their true cost of borrowing. Defendants conducted their conspiracy in secret, concealed the true nature of their unlawful conduct and acts in furtherance thereof, and actively concealed their activities through various other means and methods to avoid detection.

60.     Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants and their co-conspirators were violating the law as alleged herein until shortly before this litigation was commenced.

61.     As a result of the concealment of the conspiracy by Defendants and their coconspirators, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## VIII.   THE CONDUCT HAD AN EFFECT ON U.S. COMMERCE.

62.     Each of the Defendants was aware that their misconduct in setting an artificially low LIBOR rate would have a direct, substantial and reasonably foreseeable effect on the price of financial products tied to the LIBOR rate.

## IX.   CLASS ACTION ALLEGATIONS

63.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), individually and on behalf of all persons or entities (the "Class") who purchased or sold financial instruments the returns of which were tied to the LIBOR rate and thereby suffered a loss, between August 2007 and the present, except for persons or entities who purchased or sold such financial instruments directly from Defendants.

22

64.     This action is properly maintainable as a class action for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members of the proposed Class, who may be identified from records maintained by Defendants and/or may be notified of this action using the form of notice customarily used in class actions;

(b)     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff has the same interests as the other members of the Class.  Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class;

(c)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; and

(d)     A class action is superior to all other methods for a fair and efficient adjudication of this controversy.  There will be no difficulty in the management of this action as a class action. Furthermore, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

65.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual class member. The common questions include, *inter alia*, the following:

(a)     whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of LIBOR;

(b)     the identity of the participants of the alleged conspiracy;

(c)     the duration of the conspiracy alleged herein and the acts performed by Defendants in furtherance of the conspiracy;

(d)     whether the alleged conspiracy violated the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§1961 *et seq.*;

(e)     whether the alleged conspiracy violated the Donnelly Act and the laws of the states allowing indirect actions such as this;

(f)     whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the other members of the Plaintiff Class;

(g)     the effect of Defendants' alleged conspiracy on the LIBOR rate during the Class Period; and

(h)     the appropriate class-wide measure of damages.

## COUNT I
### For Violation of RICO, 18 U.S.C. §§1961 *et seq.*

66.     Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

### Defendants Engaged in Conduct Actionable Under RICO.

24

67. 18 U.S.C. § 1962(c) makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

68. 18 U.S.C. § 1962(d), in turn, makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

69. Under 18 U.S.C. § 1961(1), and as applicable to Section 1962, "racketeering activity" means (among other things) acts indictable under certain sections of Title 18, including 18 U.S.C. § 1341 (relating to wire fraud), and 18 U.S.C. § 1344 (relating to financial institution fraud).

70. 18 U.S.C. § 1961 (5) provides that, to constitute a "pattern of racketeering activity," conduct "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity."

71. 18 U.S.C. § 1961(3) defines "person" as "any individual or entity capable of holding a legal or beneficial interest in property," and 18 U.S.C. § 1961(4) defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

72. 18 U.S.C. § 1341, the mail fraud statute invoked by 18 U.S.C. §1961(1) as a predicate act, makes it unlawful to have "devised or intend[ed] to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute,

supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Services, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."

73.     18 U.S.C. § 1343, the wire fraud statute invoked by 18 U.S.C. § 1961(1) as a predicate act, provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

74.     18 U.S.C. § 1344, the federal bank fraud statute invoked by 18 U.S.C. § 1961(1) as a predicate act, states:

> Whoever knowingly executed, or attempts to execute, a scheme or artifice –

1. to defraud a financial institution, or
2. to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises shall be fined not more than $1,000,000 or imprisoned for not more than 30 years, or both.

75.     At all relevant times, Defendants, including the employees who conducted Defendants' affairs through illegal acts (including by communicating false interest rate quotes to the BBA or directing other employees to do so) were "person[s]" within the meaning of 18 U.S.C. § 1961(4), with a definable corporate structure and a hierarchy of corporate direction and control.

76.     At all relevant times, Plaintiff was a "person" within the meaning of 18 U.S.C. § 1961(3).

### Defendants Formed a RICO Enterprise.

77.     Defendants' collective association, including through the LIBOR Panel and/or Defendants' participation together as members of the BBA's U.S. Dollar LIBOR panel, constitutes the RICO enterprise in this action.  Every member of the enterprise participated in the process of misrepresenting their costs of borrowing to the BBA.  Using those false quotes to cause the BBA to set LIBOR artificially low, thereby allowing Defendants to increase their net interest revenues by making artificially low payments to investors such as Plaintiff, constitutes the common purpose of the enterprise.

### The Enterprise Has Perpetrated a Continuing Practice of Racketeering.

78.     For at least four years before this Complaint was filed, Defendants, in concert, made false statements to the BBA for the purpose and with the effect of manipulating LIBOR to be lower than it otherwise would have been.  Defendants did so for the purpose and with the

effect of decreasing their payments to investors such as Plaintiff and increasing their net interest revenues. Defendants earned hundreds of millions, if not billions, of dollars in wrongful profits as a result, which they shared with the employees who perpetrated the scheme. The conduct of every party involved in the scheme is hardly an isolated occurrence that resulted in one fraudulent charge.

79.    In perpetrating the fraudulent scheme, each Defendant directly or indirectly through its corporate structure has designed and implemented a uniform scheme to manipulate LIBOR. Defendants' daily making and communicating of quotes to the BBA comprise one common, uniform nearly identical system of procedures used in virtually an identical way every day.

80.    For at least the past four years, Defendants have knowingly, intentionally or recklessly engaged in an ongoing pattern of racketeering under 18 U.S.C. § 1962(c) by committing the predicate acts of mail fraud within the meaning of 18 U.S.C. § 1341, wire fraud within the meaning of 18 U.S.C. § 1343, and bank fraud within the meaning of 18 U.S.C. § 1344(2), by knowingly and intentionally implementing the scheme to make false statements about their costs of borrowing, to manipulate LIBOR, which allowed Defendants to reap unlawful profits.

81.    Defendants have committed the predicate act of mail fraud under 18 U.S.C. § 1341, thus triggering Section 1962(c) liability, by devising or intending to "devise a scheme or artifice to defraud" purchasers and holders of notes and other securities, and "for the purpose of executing such scheme or artifice or attempting so to do," placed or knowingly caused to be placed in a post office or authorized depository for mail matter, documents or packages to be

sent or delivered by the Postal Service or a private or commercial interstate carrier, or received

from those entities such documents or packages, including: (i) documents offering for sale notes

and other securities and (ii) correspondence regarding offerings of notes and other securities (the

conduct described in this paragraph is referred to as the "Mail Fraud").

82.     On information and belief, the Mail Fraud is the result of Defendants "having

devised or intended to devise a scheme or artifice to defraud" holders of notes and other

securities, for the purpose of obtaining money from those holders of notes and other securities

through "false or fraudulent pretenses, representations, or promises."

83.     By devising the scheme or artifice to defraud consumers as described herein, and

for obtaining money from holders of notes and other securities through "false or fraudulent

pretenses, representations, or promises" about LIBOR-based notes and other securities,

Defendants transmitted or caused to be transmitted by means of "wire communication in

interstate or foreign commerce, ... writings, signs, signals, [and] pictures," "for the purpose of

executing such scheme or artifice," including by: (i) transmitting documents offering notes and

other securities for sale; (ii) transmitting phony statements about their costs of borrowing; (iii)

transmitting e-mail communications relating to the process of determining, making or

transmitting phony statements about their borrowing costs; (iv) collecting funds from Plaintiff

via electronic fund transfers or electronic communication with Plaintiff's bank or credit card

institution; or (v) transmitting payments to Plaintiff.

84.     In addition to that conduct, Plaintiff is informed and believes Defendants used the

mails and wires in conjunction with reaching their agreement to make false statements about

their costs of borrowing, to manipulate LIBOR.

85.     Plaintiff does not base his RICO claims on any conduct that would have been actionable as fraud in the purchase or sale of securities or as activity in violation of Section 1 of the Sherman Act.

### The Racketeering Scheme Affected Interstate Commerce.

86.     Through the racketeering scheme described above, Defendants used the enterprise to improperly increase their profits. This action directly caused harm to holders of notes and other securities, who resided in different states.

87.     Plaintiff's allegations satisfy RICO's "interstate commerce" element because the racketeering claims alleged herein arise out of, and are based on, Defendants' use of the Internet or the mails across state lines as well as agreements between entities in different states to manipulate LIBOR.  Using those interstate channels to coordinate the scheme and transmit fraudulent statements to Plaintiff across state lines satisfies RICO's requirement of an effect on interstate commerce.

### Defendants Conspired To Violate RICO.

88.     Apart from constructing and carrying out the racketeering scheme detailed above, Defendants conspired to violate RICO, constituting a separate violation of RICO under 18 U.S.C. § 1962(d).

89.     The fraudulent scheme, as set forth above, alleges a violation of RICO in and of itself.

90.     Defendants organized and implemented the scheme, and ensured it continued uninterrupted by concealing their manipulation of LIBOR from investors, including Plaintiff.

91.    Defendants knew the scheme would defraud purchasers and holders of notes and other securities of millions of dollars of interest, yet each Defendant remained a participant despite the fraudulent nature of the enterprise. At any point while the scheme has been in place, any of the participants could have ended the scheme by abandoning the conspiracy and notifying the public and law enforcement authorities of its existence. Rather than stopping the scheme, however, the members of the enterprise deliberately chose to continue it, to the direct detriment of investors such as Plaintiff.

### Plaintiff and The Class Suffered Injury Resulting From The Pattern Of Racketeering Activity.

92.    Because Plaintiff and the Class unknowingly paid money for financial instruments that paid interest at a manipulated rate, and in fact collected less interest than they would have absent the conspiracy, Plaintiff and the Class are direct victims of Defendants' wrongful and unlawful conduct. Plaintiff and the Class' injuries were direct, proximate, foreseeable and natural consequences of Defendants' conspiracy. In making payments to Defendants, Plaintiff gave money in the custody or control of financial institutions. There are no independent factors that account for Plaintiff's economic injuries, and the loss of money satisfies RICO's injury requirement.

93.    The pattern of racketeering activity, as described in this Complaint, is continuous, ongoing and will continue unless Defendants are enjoined from continuing their racketeering practices. Defendants have consistently demonstrated their unwillingness to discontinue the illegal practices described herein, and they continue their pattern of racketeering as of the filing of this Complaint.

94.     Plaintiff and the Class are entitled to recover treble damages for the injuries they have sustained, according to proof, as well as restitution and costs of suit and reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c).

95.     As a direct and proximate result of the subject racketeering activities, Plaintiff is entitled to an order, in accordance with 18 U.S.C. § 1964(a), enjoining and prohibiting Defendants from further engaging in their unlawful conduct.

## COUNT II
### For Violation Of The Donnelly Act, Gen. Bus. Law §§ 340 *et seq.*

96.     Plaintiff incorporates by reference and realleges the preceding allegations as though fully set forth herein.

97.     Plaintiff seeks to enjoin Defendants from engaging in future anti-competitive practices and seek damages as permitted under New York Gen. Bus. Law §§ 340, et seq.

98.     Defendants have violated New York Gen. Bus. Law §§ 340, et seq. by entering into a trust, contract, combination and agreement in restraint of trade in New York.

99.     Defendants engaged in commerce in New York.

100.    Defendants, along with their co-conspirators, suppressed competition by manipulating the LIBOR rate for customers in New York, as set forth herein.

101.    New York consumers of financial products the value of which was tied to the LIBOR rate were injured by the conspiracy.

102.    Because of Defendants' anti-competitive behavior, Plaintiff has been injured because he paid more for a financial product than he would have paid in the absence of Defendants' illegal conduct.

103.    Plaintiff and members of the Class have been damaged by reason of Defendants'
unfair and/or deceptive acts alleged in this Complaint.

104.    Plaintiff anticipates amending this Complaint to add additional state law claims
on behalf of purchaser in other states that permit actions on behalf of indirect purchasers.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.    Declaring this action properly maintainable as a class action and certifying
Plaintiff as the Class representative;

B.    Awarding compensatory and/or recessionary damages in favor of Plaintiff and
other Class members against all Defendants, jointly and severally, for all damages sustained as a
result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in
this action, including counsel fees and expert fees; and

D.    Such other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all issues so triable.

Dated: August 31, 2011

Respectfully submitted,

*Patrick Klingman*

James E. Miller
Patrick A. Klingman (PK-3658)
Shepherd, Finkelman, Miller & Shah, LLP
65 Main Street

33

Chester, Connecticut  06412
(860) 526-1100
(860) 526-1120 (facsimile)
Email: jmiller@sfmslaw.com
       pklingman@sfmslaw.com

Charles E. Tompkins
Shapiro Haber & Urmy LLP
53 State Street
Boston, MA  02109
(617) 439-3939
(617) 439-0134 (facsimile)
Email: ctompkins@shulaw.com

Lesley E. Weaver
Shepherd, Finkelman, Miller & Shah, LLP
199 Fremont Street, 20th Floor
San Francisco, CA  94105-2255
(415) 992-7282
(415) 489-7701 (facsimile)
Email: lweaver@sfmslaw.com

Counsel for Plaintiff